50 N.J. Super. 223 (1958)
141 A.2d 810
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
GENNARO MORETTI, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 21, 1958.
Decided May 19, 1958.
*227 Before Judges PRICE, HANEMAN and SCHETTINO.
Mr. Thomas S. O'Brien, Assistant Prosecutor, argued the cause for plaintiff-respondent (Mr. William C. Brudnick, Special Assistant Prosecutor, on the brief; Mr. Guy W. Calissi, Bergen County Prosecutor, attorney and of counsel).
Mr. Eugene L. Dinallo argued the cause for defendant-appellant (Messrs. Heller & Laiks, attorneys).
*228 The opinion of the court was delivered by SCHETTINO, J.A.D.
Appeal is from an order of the trial court dated September 25, 1957 whereby the court held that defendant violated his probation, that the probation be revoked and that defendant serve his previously imposed sentence of a minimum of one year and a maximum of three years in State Prison.
The record indicates that defendant had graduated from a New York City college and had attended a law school in New York City for approximately a year and one-half. On April 13, 1956 defendant was convicted of atrocious assault and battery, was sentenced to a term of not less than one year nor more than three years in State Prison, and was fined $500. His sentence was suspended. Defendant was placed on probation conditioned upon his continuation of psychiatric treatment at his own expense and upon his continuing to work at gainful employment.
From the date of sentencing, defendant held a succession of jobs, none of which lasted for more than six months duration. The last time that the defendant had a job was in June 1957. Thereafter defendant continued to look for employment but was unsuccessful in securing any. His mental condition seemed to have grown progressively worse during this time until in September 1957, when, upon the advice of his psychiatrist, he was committed by his family to Bergen Pines Hospital to undergo insulin and electric shock treatment. At this time his condition was diagnosed as a schizophrenic reaction, paranoid type.
Before treatment could begin, defendant, on September 25, 1957, was charged by the chief probation officer with a violation of his probation in that (a) he failed to obtain and continue at gainful employment, (b) his mental condition made control and supervision of his probation impossible, and (c) police action was required to take defendant into custody. On that day defendant by direction of the trial judge was brought before the County Court for a hearing. The record is silent as to whether any notice of this hearing was ever served on defendant. It appears that defendant *229 was confined in the hospital and that a police officer took him into custody and brought him before the county judge. At oral argument we were informed that his family's counsel happened to be in the courthouse the day of the hearing and counsel was therefore present at the hearing.
Dr. Lederer, a psychiatrist employed by the Bergen Pines Hospital, defendant's probation officer and defendant's mother testified. The job history of defendant was outlined; his difficulty in holding a job was stressed, although it was conceded that he had made efforts to secure employment and for a substantial part of the time had been employed. The probation officer testified that defendant had not observed the court's order to receive continuous psychiatric treatment, although this charge did not hold as to the whole period. However, the probation officer did also testify that defendant reported regularly to his probation officer, that "I would say that [defendant] made a bona fide effort to be employed during the time that he was under my supervision" and, when he was asked specifically whether he would say that defendant willfully violated the rules of probation, he stated: "No, I will not." Defendant's mother testified that defendant was at home most of the time after he was out of work and she was advised by her son's psychiatrist to have him taken to the Bergen Pines Hospital for medical treatment.
On the strength of the testimony the court revoked the probation order and imposed the original sentence. The trial court stated in its oral judgment that defendant had violated the rules of probation in failing to obtain and continue in gainful employment, that defendant had a schizophrenic paranoid condition and therefore should be hospitalized, and directed defendant to serve his sentence in State Prison with a recommendation to the warden that his confinement be in the State Hospital so that he could undergo the psychiatric treatment which was then deemed necessary. The court also stated that defendant's violation of the provision that defendant should remain employed was not willful but rather was the result of his mental condition. Defendant was taken to the State Prison.
*230 Defendant appealed the revocation of probation and applied to the trial court for bail pending the appeal. The application was denied on October 16, 1957. He then applied to this court for release from prison confinement. The application was granted by order dated October 23, 1957, conditioned upon defendant remaining at the New Jersey State Hospital until the disposition of the appeal. Further application to this court was made for release of the defendant pending the prosecution of the appeal, and on December 9, 1957 this court issued an order remanding the matter to the trial court for rehearing on defendant's application for bail and for the taking of additional testimony.
In conformity with the order to remand, a summary hearing de novo was held on Friday, December 13, 1957, at the conclusion of which the trial court reaffirmed its original decision, finding a violation of probation and expressing a lack of confidence in the unanimous medical opinions and conclusions that defendant was not, at that time, psychotic. The trial court likewise denied (a) the application for bail, and (b) an application to permit defendant to return to the State Hospital, retaining the status set forth in our order of October 23, 1957 pending defendant's applying to the Appellate Division on the following Monday, December 16, 1957. The trial court remanded defendant to State Prison immediately.
This court, by order dated December 16, 1957, provided that the Sheriff of Bergen County release the defendant from custody on his own recognizance pending the further order of the court; that defendant, upon his release, report for psychiatric treatment to Dr. Lederer once a week until the final determination of this case, and that defendant have leave to report to any other private doctor for consultation or treatment as he might determine. This order further specified that the record of the prior hearing be supplemented by the testimony taken before the trial court on December 13.
This is a probation case, not a parole case. We emphasize that our views are limited in their application to the subject *231 matter of probation. See, for example, a discussion distinguishing the status of a parolee from that of a probationer in McCoy v. Harris, 108 Utah 407, 160 P.2d 721 (Sup. Ct. 1945); Ex parte Anderson, 191 Or. 409, 229 P.2d 633, 639, 230 P.2d 770, 29 A.L.R.2d 1051 (Sup. Ct. 1951), and State v. Theisen, 167 Ohio St. 119, 146 N.E.2d 865 (Sup. Ct. 1957).
In Probation and Social Adjustment (1952) by Jay Rumney and Joseph P. Murphy, published by Rutgers University Press for the Essex County Probation Office, we find the following (at page 6):
"Probation is the status of a person convicted of a crime or adjudged guilty of delinquency during a period of suspension of sentence or corrective treatment in which he is given liberty conditional on his good behavior and in which the state through its agents by personal supervision attempts to assist him during good behavior."
In "Latter-Day Procedures in the Sentencing and Treatment of Offenders in the Federal Courts," by Henry P. Chandler, Director, Administrative Office of the United States Courts  16 Federal Probation 3, 8 (March 1952), reprinted, with permission, from Virginia Law Review (October 1951), we note:

"THE NATURE AND ADVANTAGES OF PROBATION
Probation may be defined as the treatment of an offender by personal guidance and assistance without custody. The theory is that in the offender there is a core of sound impulse which by an understanding person can be brought out and made effective. Probation is really the application of wise and compassionate friendship. It is astonishing how much, with good judgment, faith, and perseverance, it can accomplish.

* * * * * * * *
A probationer * * * exists in a normal social environment as a member of a family or community. By supervision he is assisted to make the necessary adjustment of his conduct in the situation under which he will continue to live. Supervision during probation. which may be close at the beginning, is gradually relaxed as the probationer demonstrates ability to control himself, and the removal of it at the end may be almost imperceptible. The probationer has learned under the conditions of life to go under his own control." *232 Chief Justice Hughes, in Burns v. United States, 287 U.S. 216, 220, 53 S.Ct. 154, 77 L.Ed. 266, 268 (1932), stated that a probation act
"* * * was designed to provide a period of grace in order to aid the rehabilitation of a penitent offender; to take advantage of an opportunity for reformation which actual service of the suspended sentence might make less probable."
Probation differs from imprisonment in that it "seeks to accomplish the rehabilitation of persons convicted of crime by returning them to society during a period of supervision rather than sending them into the unnatural and, all too often, socially unhealthful atmosphere of prisons and reformatories." United States Attorney General's Survey of Release Procedures, Vol. II, Probation (Washington Government Printing Office, 1939), p. 447.
In Adamo v. McCorkle, 13 N.J. 561, 563 (1953), certiorari denied 347 U.S. 928, 74 S.Ct. 531, 98 L.Ed. 1080 (1954), Mr. Justice Jacobs stated:
"Probation is well recognized as an important device in our criminal jurisprudence. It is designed to aid both society and the offender by affording opportunity for correction and reform under suitable supervision. The main hope is that during the period of probation the violator will establish himself as a law-abiding and useful member of the public and thus avoid the need for actual confinement and its adverse consequences."
A comprehensive analysis of the history of probation, of the Probation Act (N.J.S. 2A:168-1 et seq.), and of the New Jersey cases are set forth by Mr. Justice Jacobs at pages 563-566 of 13 N.J. See also Crime and Correction  Selected Papers of Sheldon Glueck, chapter 9, "The Status of Probation," reprinted from 15 Mental Hygiene 1-9 (1931) (Addison-Wesley Press, Inc., 1952), on the history of probation and its nature.
In State v. Haber, 132 N.J.L. 507, 511-512 (Sup. Ct. 1945), the court stated:
"In a `summary hearing' on a penal ordinance or statute nothing will be presumed or intended in favor of the complaint or conviction. *233 Cf. State v. Rowe, 116 N.J.L. 48, 181 A. 706; affirmed 122 N.J.L. 466, 5 A.2d 697. So in a `summary hearing,' as here, concerning as it did the liberty of defendant, nothing is presumed in favor of the manner in which defendant was deprived of that liberty.

* * * * * * * *
Defendant, guilty or innocent, was entitled to due process of law  to fair play, from the beginning, throughout and in the concluding steps of the case. Cf. Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 999, 82 L.Ed. 1129, 1133; Redcay v. State Board of Education, 128 N.J.L. 281, 285, 25 A.2d 632. Justice required that defendant be given notice, opportunity to be heard and to defend himself in a timely and orderly proceeding adapted to the case."
The requirement of a notice is part of the "due process of law" read into the Probation Act by our decisions. See generally, "Right to notice and hearing before revocation of suspension of sentence, parole, conditional pardon, or probation," 29 A.L.R.2d 1074, superseding 54 A.L.R. 1471 and 132 A.L.R. 1248. Although the state statute said nothing about notice and hearing, the Supreme Court of Washington held that a substantial right of the defendant was involved and that to enter a revocation order without giving defendant notice and an opportunity to be heard is to disregard a principle as old as the law itself, and that due process of law would require the giving of notice and an opportunity to be heard before a defendant could be committed under a suspended sentence. State v. O'Neal, 147 Wash. 169, 265 P. 175 (Sup. Ct. 1928). In 15 Am Jur., Criminal Law, § 500, p. 151, we find:
"RIGHT TO NOTICE AND HEARING BEFORE REVOCATION OF SUSPENSION OR IMPOSITION OR EXECUTION OF SENTENCE
* * * the view has been taken that a convicted defendant, released under a suspended sentence, is entitled to notice and a hearing on the issue whether he has broken the conditions of the suspension of sentence, before the suspension may be revoked. This hearing must be according to some well-recognized and established rules of judicial procedure; an affidavit or other pleading setting forth the facts relied on for revocation must be filed, with opportunity to plead to the charge, and the right to cross examine witnesses must be given before revocation can be decreed." *234 See State v. Zolantakis, 70 Utah 296, 259 P. 1044, 1047, 54 A.L.R. 1463 (Sup. Ct. 1927), and Rubin, "Probation and Due Process," 31 Focus Magazine 40, 47 (N.P.P.A. March 1952).
The record of the first hearing on September 25, 1957 indicates a violation of the requirement of "fair play." State v. Haber, supra (132 N.J.L. at page 512); State v. Pascal, 1 N.J. 261 (1949). We note that no such defect can be asserted pertaining to the second hearing held on December 13, 1957. That hearing was a de novo one and defendant received all constitutional safeguards. The issues of lack of proper notice and opportunity to be heard and to prepare to defend are therefore not now before us.
The broad issue is, did the trial court commit reversible error in the exercise of the judicial discretion admittedly conferred upon it by the Probation Act? State v. Pollastrelli, 29 N.J. Super. 327, 331 (App. Div. 1954).
Authorities in other jurisdictions state that: (a) the trial court's determination to revoke probation is entitled to "conclusive presumption," Varela v. Merrill, 51 Ariz. 64, 74 P.2d 569 (Sup. Ct. 1937); (b) the appellate court will not interfere with the trial court's order revoking probation "unless a manifest abuse of discretion on the part of the lower court appears. In such a case the judge is the trier of the facts and has a very wide discretion." Olsen v. State, 21 Ga. App. 795, 95 S.E. 269 (Ct. App. 1918); (c) a trial court's ruling that defendant has violated his conditions of probation is "a matter to be determined by the sound discretion of the court, and the exercise of that discretion, in the absence of gross abuse, cannot be reviewed here." State v. Everitt, 164 N.C. 399, 79 S.E. 274, 277, 47 L.R.A.,N.S., 848 (Sup. Ct. 1913); (d) that the action of the trial court in revoking probation will not be disturbed if there is some evidence "that could reasonably be taken as showing the probationer unworthy of the relief," People v. Fields, 131 Cal. App. 56, 20 P.2d 988 (Dist. Ct. App. 1933); and finally, (e) in Burns v. United States, 287 U.S. 216, 222-223, 53 S.Ct. 154, 156, 77 L.Ed. 266, 270 *235 (1932), Chief Justice Hughes said in a case of a revocation of probation that:
"* * * The question is simply whether there has been an abuse of discretion and is to be determined in accordance with familiar principles governing the exercise of judicial discretion. That exercise implies conscientious judgment, not arbitrary action. The Styria v. Morgan, 186 U.S. 1, 9, 22 S.Ct. 731, 46 L.Ed. 1027 [1033]. It takes account of the law and the particular circumstances of the case and is `directed by the reason and conscience of the judge to a just result.' Langnes v. Green, 282 U.S. 531, 541, 51 S.Ct. 243, 247, 75 L.Ed. 520, 526. While probation is a matter of grace, the probationer is entitled to fair treatment, and is not to be made the victim of whim or caprice."
The New Jersey view is in line with Chief Justice Hughes' opinion.
This court has defined "judicial discretion" in Smith v. Smith, 17 N.J. Super. 128, 132 (App. Div. 1951):
"[As] the option which a judge may exercise between the doing and the not doing of a thing which cannot be demanded as an absolute legal right, guided by the spirit, principles and analogies of the law, and founded upon the reason and conscience of the judge, to a just result in the light of the particular circumstances of the case. 23 Words & Phrases, p. 278; Brandon v. Board of Commissioners of Town of Montclair, 124 N.J.L. 135 (Sup. Ct. 1940); affirmed 125 N.J.L. 367 (E. & A. 1940); Beronio v. Pension Commission of City of Hoboken, 130 N.J.L. 620 (E. & A. 1943); Hoffman v. Maloratsky, 112 N.J. Eq. 333 (E. & A. 1933)."
We there emphasized the two restrictions imposed upon us as an appellate court to warrant us in nullifying a ruling of a trial court made in the exercise of its conceded discretion. We stated (17 N.J. Super. at page 133):
"* * * The first is that the judicial action must have been clearly unreasonable in the light of the accompanying and surrounding circumstances, and the second condition is that the ruling must have resulted prejudicially to the rights of the party complaining.
With relation to the first condition it is not to be supposed that a mere difference in judicial opinion concerning the feasibility, expediency or pragmatical propriety of the ruling is synonymous with abuse of judicial discretion. State v. Wood, 23 N.J.L. 560, 564 (E. & A. 1847); Day v. Donohue, 62 N.J.L. 380, 383 (E. & A. 1898).
*236 Anent the second condition, Justice Southard in the early case of Ogden v. Gibbons, 5 N.J.L. 598, 612) ([*]518) (Sup. Ct. 1819), remarked (at page 626 ([*]531)): `But the inquiry always is, Has injustice been done? Has the party been injured? If he have not, no good reason can be given why he should receive the favor of trying his cause over again.' In accord, Wait v. Krewson, 59 N.J.L. 71 (Sup. Ct. 1896). Essentially it is the manifest denial of justice to a party that constitutes an abuse of discretion." (Emphasis added)
See also Hartpence v. Grouleff, 15 N.J. 545, 548 (1954), and the cases cited by the Appellate Division in the same cause, 28 N.J. Super. 125, 128 (App. Div. 1953).
In Hager v. Weber, 7 N.J. 201, 212 (1951), Mr. Justice Heher for the Court stated:
"* * * The exercise of judicial discretion `implies conscientious judgment, not arbitrary action. It takes account of the law and the particular circumstances of the case and is "directed by the reason and conscience of the judge to a just result."' Hoffman v. Maloratsky, 112 N.J. Eq. 333 (E. & A. 1933)."
And in a concurring opinion, Mr. Justice Case stated (7 N.J. at pages 213-214):
"There seems to have developed a reluctance on the part of our New Jersey appellate courts to make that holding lest perchance it be disagreeable to the trial judge. Why that feeling should exist, I do not know. Everyone conversant with court proceedings knows what the expression `abuse of discretion' means and that there is nothing more reproachful in it than there is in a finding that the trial court committed harmful error. In any event, judges have for generations borne up bravely under that castigation and are still, almost everywhere, including the federal courts, enduring it with composure. I deem it much more hurtful to say that we no longer trust the trial judge with a field of discretion in which he may move without reversal. But the language need not be retained; a substitute phrase could easily be coined. The important thing is to preserve an old and useful phase of jurisprudence  the discretion of the trial judge."
As stated in the Haber case, supra (132 N.J.L. at page 511), "In a `summary hearing' on a penal ordinance or statute nothing will be presumed or intended in favor of the complaint or conviction." Our penal laws are strictly *237 construed against the State. The law favors the liberty of individuals. Nevertheless, a breach of the conditions of probation and the unfitness of the probationer to enjoy his liberty are not required to be established beyond a reasonable doubt as is the rule which prevails in ordinary criminal proceedings. State v. Pollastrelli, supra (29 N.J. Super. at page 330); Sparks v. State, 77 Ga. App. 22, 47 S.E.2d 678 (Ct. App. 1948). It is only necessary that the judge shall have reason to believe them to be true from the report of the probation officer, or otherwise. No particular source, manner or degree of proof is required by our statute. State v. Pascal, 1 N.J. 261, 262-263 (1949). See also Ex parte Young, 121 Cal. App. 711, 10 P.2d 154, 156 (Dist. Ct. App. 1932).
The evidence at a hearing for revocation of suspension of sentence or probation does not have the same objective as that taken at a criminal trial, its purpose being to satisfy the conscience of the court as to whether the conditions of the suspended sentence have been violated. Brill v. State, 159 Fla. 682, 32 So.2d 607 (Sup. Ct. 1947).
R.R. 1:5-4(b) provides:
"On a review of any cause, criminal or civil, involving issues of fact not determined by the verdict of a jury, new or amended findings of fact may be made, but due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."
It is true that every internment is in favor of the judgment under review, and we should only make our own finding if we are well satisfied that the trial court's finding is a mistaken one and offends the interests of justice. N.J. Highway Authority v. J. & F. Holding Co., 40 N.J. Super. 309, 317 (App. Div. 1956). However, respect for the trial court's finding imposes no restraint on our power fully to analyze the proofs and reach a conclusion whether or not the finding is consistent with the evidence. Gagliano v. Maggio, 32 N.J. Super. 219, 225 (App. Div. 1954), certification denied 17 N.J. 57 (1954). The exercise of our permissive power is brought into play when "required to *238 do justice in the particular case." Midler v. Heinowitz, 10 N.J. 123, 128 (1952).
We examine the testimony of the two hearings.
On September 25, 1957, Dr. Lederer testified that on that date defendant was mentally ill; that he was suffering from a schizophrenic reaction of a paranoid type; that it was necessary that defendant receive treatment in the form of prolonged hospitalization with possibly deep insulin coma treatment and if necessary combined with electric shock therapy; that defendant needed help badly and that he was a sick boy.
The probation officer testified that he supervised the probation of the defendant from the date of sentence; that defendant secured a job as required by the probation order in May 1956 with a rug company in Englewood and was discharged from that job in June because of lack of work and because he was not particularly adapted to the work; that in July 1956 defendant secured work at a New York hotel and was employed there until February 1957; that from February 1957 to May 1957 defendant was employed by a water softening company and attempted to get other employment through the State Employment Office, but was unsuccessful; that in May 1957 defendant secured work in Englewood with a textile company where defendant worked for one week and was discharged because the company felt he was unsuited for the job; that since May 1957 defendant tried to find work and could not do so, and that on August 6, 1957 defendant planned to go into the newspaper business with his brother, but the plan did not materialize. The probation officer stated that on defendant's last report to him, September 9, 1957, defendant informed him that he planned to secure a machine for laminating plastics and would try to do the work in his own home since he was unable to find work. He stated that defendant never refused to accept work. He was emphatic in stating, "I would say that he made a bona fide effort to be employed during the time that he was under my supervision," and that the reason defendant was unemployed during that *239 period was because defendant was unsuccessful in securing work although he did make efforts to secure work.
The probation officer was asked:
"You will not say then that he willfully violated the rules of probation, will you?"
His answer was:
"No, I will not."
The officer further testified that defendant did generally comply with the provisions that he receive psychiatric treatment, and that defendant had been receiving such treatments as required by the court's order from Dr. Policastro of Hackensack. He also stated that on September 19, 1957 he received a telephone call from Dr. Policastro and learned from Dr. Lederer that defendant was confined to the Psychiatric Division of Bergen Pines County Hospital. Although defendant's acts were not willful, it appeared to the officer that defendant was unable to absorb the subject matter of their conversation due to his mental illness, and this made control and supervision impossible. This probation officer had never filed a charge for violation of any condition of probation against defendant.
At the rehearing on December 13, 1957 the probation officer again was called and testified:
"Q. In your opinion, did he ever willfully violate his probation? A. No, he did not.
Q. Would you say, Mr. James, in your opinion, that the reason he could not secure employment during the two-months prior to his commitment was due to his mental condition, after consulting with Dr. Policastro? A. After consulting with Dr. Policastro and after having observed the young man under several situations and having attempted to interpret to him what the court, the Probation Department, wished him to do, I would say that the man's mental condition appeared to be that which would keep him from being acceptable to an employer.
Q. Would you say that he made a bona fide effort and attempt to secure work, Mr. James, during his probation period? A. My feeling has been throughout the entire probation period that he had been willing, he had made many attempts and was trying to the best of his ability to secure employment."
*240 At the December 13, 1957 hearing defendant submitted testimony of medical experts. Dr. James B. Spradley of Trenton, with 40 years of experience in diagnosis and treatment of nervous and mental diseases, a retired Superintendent of the New Jersey State Hospital at Trenton, the psychiatric consultant to the New Jersey Neuropsychiatric Institute and to the Institution for Feeble-minded Males in New Lisbon, testified that defendant was non-psychotic; that from a mental standpoint he was fully qualified to adjust himself both socially and industrially and that no anti-social behavior would be exhibited were defendant to be sent out into society, and that defendant was fit to go out into society. He stated: "My examination is at this time this man is not insane," and pointed out that his view was shared by a disinterested group of doctors of the State Hospital who observed defendant 24 hours a day over a period of weeks. He concluded: "I certainly don't think he requires any treatment in any institution * * *."
He also testified that there was made available to him the report of the State Prison's psychiatrist, Dr. Boyle. We note the following questions and answers in Dr. Spradley's testimony:
"Q. Doctor, earlier in your testimony you referred to a report of a Dr. Boyle, was it? A. Yes, sir.
Q. Which you used in your determination when you made this examination at State Prison. Who is Dr. Boyle? A. Dr. Boyle is the psychiatrist who was formerly with the State of New Jersey, a subordinate to Dr. Garber, who is here. He is now the psychiatrist for the New Jersey State Prison at Trenton.
Q. Did you read that report, Doctor? A. Yes. Mr. Goodman made available to me the report of Dr. Boyle. Dr. Boyle was ill at the time and I personally could not consult with him, but the report was made available and Dr. Boyle had reported to the Warden that his examination indicated that Mr. Moretti was not insane and that he would not recommend the transfer of Mr. Moretti to the State Hospital for treatments since he did not feel that he needed treatment. I concurred in that at the time of my examination and I still concur in that."
Dr. Robert S. Garber of Princeton, Superintendent of the New Jersey Neuropsychiatric Institute, specializing in neuropsychiatry *241 since 1938 and a recognized authority, testified that defendant was suffering from no psychosis, nor from any form of insanity or mental illness; that defendant displayed a personality defect and was in need of supportive therapy, i.e., periodic consultation with a competent psychiatrist to give him support and reassurance; and that defendant could not get this treatment in State Prison. Dr. Garber stated:
"My testimony is this, that I feel confident that if Mr. Moretti were released from the institutional environment the likelihood of his adjusting without any help at all is favorable, that very possibly this would occur, but I think for him to enjoy the maximum pleasure out of life that it would be far more beneficial if he could have the opportunity of receiving this assistance."
He also gave as his opinion:
"* * * I think it would be beneficial to him to be returned to society because the nature of the personality defect that he is suffering from is such that continued residence in an institutional environment is contra-indicated."
Dr. Robert E. Bennett, Assistant Medical Director of the State Hospital at Trenton, specializing in psychiatry, testified that defendant for the seven preceding weeks was at the State Hospital under his direct supervision. He said it was the opinion of himself and the staff that defendant should be discharged from the Hospital as non-psychotic, and that upon his release it was the recommendation that he receive psychiatric out-patient treatment, similar to the supportive therapy as described by Dr. Garber. He concluded:
"A. It is my opinion and the opinion of the Staff of the Hospital that he does not belong at this time in a mental hospital, that he would benefit more by being able to associate in normal society with other people and to continue to receive out-patient therapy from a qualified psychiatrist in the community."

* * * * * * * *
"Q. In your opinion, if he were remanded back to State Prison would that improve or would it deter his mental stability at this time? A. It certainly would not improve his condition. Mr. Moretti is a very sensitive, easily hurt individual. He had a marked feeling *242 of inferiority and insecurity and to go into a restrictive environment such as that with the type of people they have down there, I don't feel that would be at all beneficial. In fact, I think it would be detrimental to him."
Dr. Policastro, who treated defendant during the period of probation, testified that defendant's failure to procure employment was due to his mental condition. He pointed out that he was greatly upset by the action taken by the trial court as it might affect defendant. He stated:
"* * * Confidentially, between you and me, I wish I had never gotten it right from the beginning. I didn't like the case. However, I fulfilled my duty because I treat many cases for the Probation Department.
It was a case that was not easy to treat. It was a case that gave me a lot of unpleasant feelings about it right from the beginning and I had nothing to gain by it and I was overcome and disturbed emotionally how the whole thing terminated at the end.
I even went to the Probation Department. I spoke to Mr. Chandler and Mr. James. I couldn't see in my honest opinion how this boy had violated any probation. They were informing me, I was informing them, we kept in touch. The boy showed up for treatment. In fact, of all the cases that I am treating, the criminal cases that I am still treating for the Probation Department now, I would say that he was one of the most cooperative I had and I was very disturbed and Mr. James knows about it. I even went down there and discussed it with him."
Preliminary, we note that, although the complaint which was the basis of these hearings was signed by the chief probation officer, the trial court in its oral decision stated:
"* * * And his plight was apparently such that his own family felt that it was so necessary that he get additional treatment to that which Dr. Policastro was giving him, that they went to the extent of having him committed to Bergen Pines and taken to Bergen Pines for observation, and as Dr. Policastro testified, treatment.
That is when the case came to my attention, when this subject that I placed on probation wound up at Bergen Pines psychiatric ward and that is when I called everyone together and brought Moretti down here for a hearing to find out whether or not he should be continued on probation under the circumstances, and as a result of which hearing I found that he should not, and remanded him to State Prison to serve his sentence, revoking probation and revoking the suspension of sentence and imposing the sentence originally imposed."
*243 The trial court stated with reference to a finding that defendant violated the condition of probation relating to gainful employment that:
"* * * And it doesn't matter if he didn't because he wasn't of a mind to, or his mind was not up to it, or that he didn't because he deliberately refused to cooperate, didn't care to work, the fact is he did not obtain and continue to work at gainful employment all summer, which is a very bad condition and a very bad sign for one who is under psychiatric treatment.
The fact that he didn't willfully do it  which is saying in another way he was not of a mind to do it  indicates his mind was not that of a probationer or of a subject fit for probation. A person who was of a mind that he is not able to or not up to going out and getting and maintaining and keeping gainful occupation is not a fit mind for probation, for society."
We cannot agree with the trial court's finding. Defendant was sick in mind, needing hospital psychiatric care. When first placed on probation, one of the conditions was that defendant continue psychiatric treatment. We feel that hospitalization suggested by Dr. Policastro was consistent with the terms of the probation and not a violation thereof. The actions of his family in following the medical advice of Dr. Policastro did not imply that defendant was violating his probation. On the contrary, the family thought that the hospital treatments might produce a better mental condition in defendant and quickly restore him to a place in society.
We feel that all the testimony clearly indicates that, even if there were violations, the violations were technical and not willful and that defendant established valid excuses if not reasons for his non-compliance. Certainly, it cannot be denied that had defendant been seriously injured in an accident requiring hospitalization for months, or stricken with some physical disease rendering him unable to obtain work, no court would be justified in holding that he had violated the gainful employment condition of his probation. We hold that his mental illness impediment amounted to a lawful excuse. Ex parte Alvarez v. State, *244 50 Fla. 24, 39 So. 481 (Sup. Ct. 1905). We cannot, on the basis of the medical testimony and the testimony of the probation officer, sustain the trial court's conclusion that defendant violated the gainful employment provision of the probation.
Until the trial court brought about the hearing of September 25, 1957, no report had been made by the probation office that defendant's mental condition made control and supervision of probation impossible. On the testimony of Dr. Policastro and of the probation officer, we find that defendant's case was not an easy one to handle. But then, problems are naturally anticipated in the field of probation. Revocation should not be used as a means of resolving difficult cases, nor should it be used merely to punish a technical violator for failure to adhere to regulations. There should be as much constructive purpose in committing an alleged violator to prison as there was in placing him on probation in the first instance. Probation conditions are a means to an end, not an end in themselves. We are on the path to greater success in our treatment of probationers when we are able to interpret to them the specific restrictions imposed on them, not as blueprints of the perfect man, but rather as guides to probationers' growth in their responsibility from day to day.
At all times courts are cognizant of the difficulties of supervising and controlling probationers. Judge Alexander Holtzoff, United States District Court Judge for the District of Columbia, stated in his article, "Duties and Rights of Probationers," 21 Federal Probation 3, 5 (December 1957):
"Supervision of a probationer is a difficult and delicate task from a psychological standpoint and requires diplomacy, discernment, and discretion, as well as firmness. An understanding of practical psychology becomes indispensable. It should be always kept in mind that the aim of probation is to protect society against a repetition of the defendant's depredations by rehabilitating him and transforming him into a law-abiding member of the community. A human being, however, especially an adult, cannot be molded and fashioned at will. The probation officer is not dealing with an automation, but with a personality. In some few matters, rigid control and *245 specific compulsory requirements may be proper and desirable. In other respects, considerable leeway must be allowed to the probationer. Advice as contrasted with directions is always appropriate and frequently more discreet and more productive of results. The probation officer on one hand acts as a supervisor and is in a position to give some express orders, if the probation order authorizes him to do so. He also operates as an advisor and can help much in that capacity. In fact, it is in the last mentioned sphere that the greatest skill is required and the most good can be accomplished."
Additionally, we note in "Further Comments on the Sentencing Problem," by Sheldon Glueck, Roscoe Pound Professor of Law, Harvard Law School, 21 Federal Probation 47, 48 (December 1957):
"I then quote approvingly the following from Miss Helen Pigeon's Probation and Parole in Theory and Practice:
`* * * In dealing with personal problems it is necessary to deepen the offender's understanding of himself and his situation, to enlarge his capacity to deal with it, to fulfill his emotional needs, to find new satisfactions which will take the place of old ones, and to build sound relationships. The offender must reach the point where he finds pleasure in conforming, in being an acceptable part of the social order and in achieving some status. He should be helped to find something to live by, something which is for him "the good life."'"
Difficult though defendant's supervision was, defendant's probation officer had defendant under control. He reported no violation to his superior or to the trial court. We hold that defendant had been and was fit for control and supervision.
Finally, we note the following remarks of the trial court:
"Now with all this psychiatric testimony surrounding me and surrounding this case  we run the whole scale of mental conditions from schizophrenic, paranoid type, down to a rigid personality  if I released Moretti on probation and gave him another chance, as I would like to do, and anything happened to him or to any member of his family or any of his associates in any way, I would be responsible as the Judge who released him on probation in the face of all this testimony and this record, and while I would like to release him on probation and give him another chance and go along with the three State psychiatrists that everything will be all right if we do, frankly, I haven't got the confidence in their opinion or *246 in Moretti, after what has happened from the time he has been on probation, to take that chance again. (Emphasis added)

* * * * * * * *
We have in our country and we have had here in northern New Jersey and we have had right here in Bergen County too many cases of persons with a mental quirk committing very serious offenses and we don't want that to happen to Moretti, and we don't want anybody to be his victim and neither does he nor his family, and too many times in our own State history, recently, persons have been released under the very circumstances of this case and committed offenses and the public has come forward and complained, `Who let him loose?'
`Who let that person out in that mental condition?'"
The fears expressed by the trial court are real and not fanciful. In our own decision we are conscious of these same apprehensions. As a method of treating offenders probation is of comparative recent development, if not origin. As with all social inventions there is a timidity and reluctance on the part of society towards full acceptance. Especially is the feeling prevalent in our day of increased criminal activities. See "Probation and the Newspaper," by Nino Lo Bello, Department of Sociology and Anthropology, University of Kansas, 16 Federal Probation 36. However,
"* * * every scrap of authentic information from those who have been waging war against crime and criminals, night and day, reveals that there is but one way to reduce crime. That is through a policy of prevention. [at page 205]

* * * * * * * *
If the criminal's past history gives good reason to believe that he is not of the naturally criminal type, that he is capable of real reform and of becoming a useful citizen, there is no doubt that probation, viewed from the selfish standpoint of protection to society alone, is the most efficient method that we have, and yet it is the least appreciated of all our efforts to rid society of the criminal." (at page 208, emphasis added) Franklin D. Roosevelt, Looking Forward, (John Day, New York, 1933).
Nevertheless, some fears that a probationer will violate the conditions of probation are justified. For example, in the United States Attorney General's Survey of Release Procedures, Probation, supra, at pages 335 et seq., under the title of "Frequency of Revocation," a study was made of *247 19,256 cases in 25 probation units in 16 states and the District of Columbia. The units included Essex County with a listed number of 962 cases. We find noted:
"* * * The data collected reveal that in almost all departments a higher percentage of offense violations resulted in revocation, while violations of conditions less frequently resulted in revocation.

* * * * * * * *
Of the 19,256 cases analyzed, 11,712 (61 percent) revealed no recorded violations during the probation period, whereas the records of 7,544 probationers (39 percent) showed that the terms of release had been violated. 3,497 (18 percent) of these recorded violations were new-offense violations, and 4,047 (21 percent) were violations of conditions. However, not all of the recorded violations resulted in revocation. Revocation was ordered in 3,624 cases, or 19 percent of the total cases. The probationary terms of 2,288 offenders (12 percent) were revoked for violations by new offenses, and in 1,336 cases (7 percent) revocation was ordered because of violation of conditions." (at page 337)
"It appears, therefore, that about two-fifths of the probationers considered violated the terms of release, but that revocation occurred in less than one-fifth of the total cases. Moreover, although recorded violations of conditions constituted a larger proportion of the total cases than violations by new offenses, the number of revocations for new offenses was significantly larger than the number of revocations for violations of conditions. It is not surprising, however, that fewer violations in the new-offense group should go unrevoked. Offense violations are not only more serious, but departments frequently consider violations of minor conditions a matter rather for informal adjustment than for revocation." (at page 338)

* * * * * * * *
"To summarize the data on frequency of revocation, it appears that (1) 19 percent, or about one-fifth of the 19,256 cases studied resulted in revocation; (2) almost one-third of the recidivists, or 32 percent, had their probations revoked, whereas only 14 percent of the first offenders were accorded similar treatment; (3) the probationary terms of 34 percent of the totally unemployed probationers were revoked, as contrasted to only 7 percent of the fully employed probationers; * * *." (at page 342)
The survey concluded:
"Although this Survey sets forth many of the shortcomings of American probation laws and administrative practices, there is one conclusion which overshadows all the rest; namely, that the advantages of probation as an aid to crime prevention and to the rehabilitation of offenders far exceed in importance its weaknesses and defects. Prisons today are a success as custodial institutions for *248 dangerous criminals but as forces for rehabilitating offenders, they stand as sordid reminders of failure. Many men are being sent to prison only to come out worse social misfits than when they entered. Now that these facts are recognized, it becomes increasingly apparent that the basic principles of probation are sound and that its use should be widely extended rather than curtailed.
Probation must play a large part in any program which aims at the ultimate control of crime. As Attorney General Cummings recently pointed out:
`Probation is a method of discipline and treatment. If probationers are carefully chosen and the supervisory work is performed with intelligence and understanding, we can work miracles in rehabilitation.'" (at page 471, emphasis added)
Despite this record evidence of failure of probation in a goodly percentage of cases, we should not hesitate to advocate and sponsor probation "When it shall appear that the best interests of the public as well as the defendant will be subserved thereby * * *." N.J.S. 2A:168-1.
We suggest a viewpoint towards probation requirements which seems to us to be realistic. A probationer is not expected or required at once to achieve perfection. If his conduct is that of the ordinary well-behaved person, with no serious offenses charged against him and with no indication that he intends in the future to pursue the course which led to his original conviction, the courts and probation officers should not revoke probation upon technical violations. Society and the probationer will both benefit despite the sometime justifiable fears and risks.
On the finding of the trial court that defendant was not fit for probation because police action was necessary to get defendant from his home to Bergen Pines Hospital, the testimony hardly can be stretched to encompass the implications produced by the words of the court's finding. Defendant's family had visited a New York doctor, who recommended that defendant enter a Long Island hospital. Defendant refused to leave home and go. Defendant's family consulted Dr. Policastro who testified with reference to the police action as follows:
"At that time the family had informed me that they could not get him out of the house, that they could not get him to go to the doctor *249 in New York, and I informed them that there was nothing that I could do for him, the only thing, that if he didn't want to go to a hospital in New York that the best thing I could do was to get him in up at Bergen Pines.
So then I informed the brother to come to my office and I made commitment papers. The commitment papers were then given to the brother and I told them that they could bring him to Bergen Pines. I got in touch by telephone with Bergen Pines, got him a bed. However, they told me that he would not go. Then I informed them to get in touch with the Police of the community, that I was sure they would be glad to help him.
The Chief of Police of the community called me up and I told him that I had made arrangements with Bergen Pines to have him committed, that I had made out the papers and that it was just a matter of taking him there because the hospital was waiting for him and that's the end of my treatment in the case."
As a result, five police officers went to defendant's home. Three of them testified. They stated that defendant was not violent, did not resist the officers and did not use abusive language, and that they put defendant into a strait jacket "merely as a precautionary measure." We find no lack of cooperation with public authority on this phase of the defendant's conduct.
We hold that the ends of justice require (a) the setting aside of the order of revocation, and (b) reconstituting defendant to probation. Smith v. Smith, supra (17 N.J. Super. at page 133). However, we impose as additional and supplemental conditions those provisions of our order of December 16, 1957 requiring defendant to report for psychiatric treatment to Dr. Lederer once a week and permitting defendant to report to any private doctor for consultation or treatment as he may determine. We add these requirements as the result of a letter report, dated March 27, 1958, received by us from Dr. Lederer. In his report, Dr. Lederer points out that:
"* * * On February 5, 1958, Mr. Moretti informed me that he had started school `two days ago,' and that he was attending a course in Business Organization and Accounting for 2 1/2 hours each per week. Since that time we have discussed mainly his inter-personal relationships at school and at home. Mr. Moretti has made efforts not only to fulfill his obligations towards his school work *250 but also towards socialization. The patient since then has found the courses very interesting. He only missed one lecture because of weather conditions. He studies between seven and ten hours a week for his school work and apparently derives satisfaction from what he is doing.

* * * * * * * *
At the present time the patient appears most tractable and conscientious towards his assignments. There appears to be some poverty of ideation, and his verbal productivity is still limited. However, the patient, to the best of his ability, makes every effort to regain his health and to become a useful member of society. No paranoid delusions or misinterpretations are in evidence, and it is felt that the patient is not dangerous to society at the present time; however, continuation of psychotherapy appears indicated."
Society and defendant have benefited from Dr. Lederer's efforts. We therefore are adopting his recommendation and are making it an additional condition of defendant's probation.
Reversed with directions to the trial court to enter an order not inconsistent with this opinion.