## LEO RITES *v.* STATE OF MARYLAND

[No. 585, September Term, 1971.]

*Decided May 17, 1972.*

The cause was argued before ANDERSON, ORTH and GILBERT, JJ.

*Joseph R. Raymond,* for appellant.

*Harry A. E. Taylor, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton*

*B. Allen, State's Attorney for Baltimore City,* and *Leslie L. Gladstone, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

It is established that, as a requirement of due process of law, probation granted upon conditions imposed when sentence in a criminal case is suspended cannot be revoked without giving the probationer a hearing. *Wilson v. State,* 6 Md. App. 397, 402. When revocation of probation is within the jurisdiction of the Criminal Court of Baltimore a hearing thereon is also required by statute. *Code of the Public Local Laws of Baltimore City,* § 22-85 (Everstine, 1969).[1] The purpose of the hearing on an al-

1. Section 22-83 of the *Code of Public Local Laws of Baltimore City* empowers the "Criminal Court of Baltimore City" (*sic,* see *Constitution of Maryland,* Art. IV, Part IV, § 27) to suspend sentence, grant probation, and impose conditions. Section 22-84 authorizes the court to change the conditions. Section 22-85 reads:

"The said Court shall have power to fix the period of probation and suspension of sentence, which period shall not in any event exceed five years from the date of such suspended sentence or probation, and which said period shall also not exceed the maximum sentence of imprisonment to which such person may be sentenced on any count of the indictment or charge with which he stands accused (but in neither case to exceed five years). Said Court, from time to time, may continue to extend the period of probation and suspension of sentence first fixed, until the conditions originally or thereafter prescribed by the Court shall have been fulfilled, but the length of the entire period shall in no event exceed the maximum time herein prescribed. The Court at any time may end such period, or, during such period, on written charges preferred under oath, of violation of any condition of probation, may issue a warrant or notice requiring the traverser, probationer or person accused to be brought before, or appear before said Court, to answer such charges of violation of conditions of probation or suspension of sentence, and to fix a date for the hearing of such charge or violation of said conditions. Pending the hearing or determination of such charge, the person accused may be sent to jail by said Court, or may be by it released, with or without bail, as said Court may determine. If at such hearing the person accused be found by said Court to have violated any of the terms of said conditions of probation said Court may revoke the probation granted or suspension of sentence, and may impose any sentence, to take effect from its date, which it might have originally imposed for the crime of which said traverser, probationer or person accused was

legation of violation of the terms of probation is to determine judicially whether the conduct of the probationer during the probation period had conformed to the course outlined in the order of probation. The violation must be established with such reasonable certainty as to satisfy the conscience of the court of the truth of the violation, not beyond a reasonable doubt, but sufficiently to incline a reasonable and impartial mind to the belief that the terms of probation were violated. If the facts coming to the knowledge of the court, not necessarily in the manner required by the rules of evidence, justify revocation, the act of revocation would not be arbitrary or capricious and will not be set aside on appellate review. *Smith v. State,* 11 Md. App. 317, 318-319, cert. denied 262 Md. 749; *Knight v. State,* 7 Md. App. 313.

On 2 February 1971 LEO RITES pleaded guilty in the Criminal Court of Baltimore to malicious destruction of property on which a 1 year sentence was imposed and to being a rogue and vabagond on which a consecutive 3 year sentence was imposed. Each sentence was suspended and he was released on probation in the care of the Probation Department for a period of 4 years. The "Order for Probation" signed by Dorf, J. contained eight conditions, including as the first "That the Defendant shall report to his Probation Officer as directed"; as the sixth "That said Defendant shall pay, through the Probation Department of the Supreme Bench * * * $77.50 Court Costs"; and as the eighth "pay appt'd atty fee of $150.00. Participate in any drug program designated by Probation Dept." On 15 April 1971 a petition sworn to by Jack Hyatt, Probation Officer, alleged that Rites "has violated the following conditions of his Probation, in that:

1. He failed to report as directed.
2. He failed to pay his Court Costs and Attorney's Fee as ordered by the Court.

---

either convicted or to which he pleaded guilty or *nolo contendere;* or if neither conviction nor plea of guilty or *nolo contendere* was had, then the person accused may be tried on said indictment or charge."

3. He failed to participate in a narcotic program."

Upon hearing on 2 June 1971 he was found "guilty of violation of probation." Probation was revoked and the sentences originally imposed were reinstated with credit of 5 months for jail time served but to begin at the expiration of the sentence he was currently serving. He appealed and claims that the lower court abused its discretion in determining that he had violated the conditions of his probation.

At the hearing Jack Hyatt, the Probation Officer, charged with the supervision of Rites, was the only witness on behalf of the State.

## THE FIRST ALLEGED VIOLATION

Hyatt said that Rites failed to report on April 2, 1971 and April 8, 1971—"those are the two dates I'm charging him with failing to report." Hyatt had personal knowledge that Rites had notice to appear on those two days. "I sent out Department notices with the dates on the notices instructing the probationer to report in the Probation Department, Room 101, on those dates. Those notices are written by myself, not secretary." They were not returned by the Post Office. On cross-examination it appeared that the 2 April meeting was not to have been with Hyatt but with "our Job Bank Counselor, Mr. Pollitus, a Probation Officer" and that Hyatt was "not in a position to say" whether or not Rites kept the appointment.[2]

The transcript of the hearing shows only one reference to the failure to report on 8 April 1971 during the direct examination of Hyatt after the bald statement that Rites

2. Hyatt also said on cross-examination that at his first meeting with Rites he told Rites "he had to report to his Probation Officer as directed." He thereafter saw Rites on 9 February and 26 February. The initial interview on 2 February took about 20 or 30 minutes; the other two meetings, at which the only thing discussed was employment, lasted about 5 or 10 minutes. At the 26 February meeting Rites said he had a job as a painter's helper at $50 a week.

failed to report on that date. With respect to the payment of court costs, Hyatt was asked if there had been any reason proffered why no payment had been made. He replied: "Someone called me on April the 8th to state that the defendant was working in Laurel, Maryland, so if he was working, which I didn't know about, I don't know why he wouldn't have paid it, unless I didn't give * * *." On cross-examination Hyatt said: "I got a call from Mrs. Meadows who said that Mr. Rites was working in Laurel, Maryland." On redirect examination it was elicited that the call was received on the date Rites was "supposed to appear in [Hyatt's] office." Hyatt was asked: "Is it permissible for someone to call and say that they will not be in your office?" He replied: "No, it is not."

Rites testified in his own behalf. He read a lengthy paper he had written. With respect to what was patently the 8 April appointment he explained:

> "* * * I went to work with Mr. Meadows, we were working next to Washington, D.C.[3] I was his helper. I knew I had an interview with my Probation Officer, however, I asked Mr. Meadows' daughter to call him up and explain the situation to him and that if it would be all right for me to call him, or write my report to him because I didn't want to lose my job for taking a day off from work. I thought he would understand. Mrs. Meadows called him up; he made an appointment for April 16, 1971; I was arrested April 14th, 1971[4] for a charge I did not do, which I have an appeal in now on.
>
> Your Honor, to be truthful, I could have seen Mr. Hyatt on the appointment he had set up the date because Mr. Meadows said he would explain the situation. However, Your Honor, Mr.

---

3. The second condition of probation included that Rites "shall not leave the City of Baltimore without the consent of the Court." He was not charged with a violation of this condition.

4. The third condition of probation included that Rites "shall conduct himself in a law abiding manner." He was not charged with a violation of this condition.

Hyatt would call me in his office; two to five minutes later be rid of me. I could not see losing a day's work for this unless it was absolutely necessary. I thought the Probation Officer would understand, but over the telephone he displayed lack of concern and said for me to be in his office April 16, 1971. I would have been, if it weren't for my arrest which I feel when I go to Court on the appeal I'll be found not guilty."

On cross-examination the subject was briefly pursued:

"Q. [by the Assistant State's Attorney]: And you didn't want to lose a day of work and that's why you didn't come in to see your Probation Officer; is that right?

A. [by Rites]: Yes. I saw no sense in it.

Q. You saw no sense in it. And, you made that decision, did you not?

A. Yes, because of Mr. Hyatt's attitude.

Q. Because of Mr. Hyatt's attitude, not because of your own attitude?

A. And because I had an attitude towards him.

Q. You also had an attitude; did you not? So, you are equally to blame for the attitude; are you not?

A. Yes, I say both."

The court inquired why Rites did not personally contact Hyatt. Rites said: "Because I was working out of the City and it was a long distance phone call. At that time, I didn't have the money on me to do this and eat lunch and pay for my expense back and forth."

## THE SECOND ALLEGED VIOLATION

During the direct examination Hyatt said that a condition of probation was the payment of court costs. Asked about the payment of an attorney's fee, he said: "Conditions of probation, the only financial condition of probation was payment of $77.50 Court costs." He said that no

payment had been received. "Our checks and accounting department indicated that no payment had been made." When asked if any reason had been offered why no payment had been made he told about the telephone call informing him that Rites was working and concluded: "I don't know why he wouldn't have paid it, unless I didn't give—" That last thought was not completed. On cross-examination when he was asked what he had discussed with Rites at the first meeting on 2 February he apparently refreshed his memory by reading from the Order of Probation, and mentioned each of the conditions therein. When he reached the 6th and 8th conditions he said: "And that he had to pay $77.50 Court costs; $150 attorney's fee. I didn't see that before, the $150 attorney's fee. And, he had to pay that." He explained: "Well, usually the fees are written in a certain slot provided for it in the Court order. When I was testifying to questions of the State's Attorney, I didn't see it, but it is handwritten in below." He was asked: "But, more precisely, you did advise Mr. Rites of it though, or didn't you?" He replied: "I do believe I advised Mr. Rites of it." It was also elicited from Hyatt that he did not know as a fact that Rites had no money when placed on probation but "I imagine he had no money." Hyatt wanted Rites to get a job. Hyatt said: "I felt that the present time the most urgent thing to do was to get Mr. Rites a job so he could begin the drug program and get money in his pocket so he could try to stabilize himself." On 26 February Rites told Hyatt "he was making $50 a week as a painter's helper for Mr. Medien or something like that." It was clear from Hyatt's testimony that he had not told Rites to comply with the financial conditions of the probation before 26 February. Nor did it appear that Hyatt made any kind of definite arrangements with Rites to pay the court costs and attorney fee after Rites informed Hyatt he had a job. Hyatt testified he did not have a "specific recollection" what he told Rites at the 26 February interview. "In all probability what I told him, I said would give him a month to try to accumulate some money to stabilize himself so that he

could start getting himself involved in a drug program and start making payments towards his Court costs and attorney's fees." Hyatt had no further contact with Rites during the period from 26 February and the time the warrant was issued for violation of the probation.

## THE THIRD ALLEGED VIOLATION

Hyatt admitted at the hearing: "At no time did I specifically refer Mr. Rites to a drug program." He did not tell Rites where or whom to submit any urine specimens. If he discussed drug programs at all it would have been "in a general way." "I would have had to discuss drug programs if I explained his conditions of probation." But when Hyatt was discussing the conditions of probation at the hearing he said: "The probationer is to refrain from illegal use of drugs; probationer shall undergo treatment for drug addiction in accordance with the instructions of his Probation Officer; that he shall produce urine specimens at such time and place and under such conditions as his Probation Officer may direct; probationer shall pay for costs of urinalysis at such time each urine specimen is submitted for analysis, results of such test may be considered proof of violation of probation should they indicate presence of forbidden drugs." The transcript reads:

"Q. [by defense counsel]: I see. And, what arrangements did you provide for him to make urine specimens and submit them?
A. Since Mr. Rites was unemployed and wanted to get on Welfare during his initial interview, I desired to give him a grace period—
Q. You didn't make any arrangements?
A. No, I didn't.
Q. What program did you tell Mr. Rites to avail himself of in the drug abuse?
A. I did not make any specific referrals during that time."

With respect to the second and third alleged violations

we do not feel that the hearing judge could properly be satisfied of the truth that they were violated because we do not find that the evidence adduced was sufficient to incline a reasonable and impartial mind to the belief that the terms of probation were violated. As to the second, the condition as spelled out in the order was that Rites pay the court costs and attorney fee. But the order did not designate when during the probationary period they were to be paid, implicitly leaving it to the discretion of the Probation Officer. But there was no evidence that Rites had been directed by Hyatt to pay any designated sum at any designated time—and in fact it appeared that Hyatt felt it advisable, even after Rites obtained a job, that Rites have an opportunity to accumulate some money before beginning to comply with the financial conditions of the probation. As to the third violation, the condition was that Rites "participate in any drug program designated by Probation Dept." The evidence clearly showed that no drug program was so designated by the Probation Department. Rites could not properly be found guilty under the second and third violations charged.

As to the first alleged violation, the condition was that Rites report to his Probation Officer as directed. He was charged with failing to report on 2 April and 8 April 1971. Hyatt could not say whether or not Rites reported on 2 April as directed. This evidence was not sufficient to establish that Rites failed to report on 2 April. It is clear that Rites was directed to report on 8 April and did not appear in person. It is not clear that he was directed to appear physically, although it seems that this is what was contemplated. But Hyatt verified both the testimony of Rites and Mrs. Meadows that Mrs. Meadows telephoned him on 8 April and informed him that Rites was working, a result for which Hyatt had been striving since he was given the supervision of Rites. According to Rites, Hyatt simply made a date for another appointment on 16 April. Mrs. Meadows indicated that Hyatt had "set up another date for an appointment." Hyatt's testimony was silent on the matter, neither corroborating nor refuting

that he had simply made another appointment for Rites to report to him when told why Rites was not reporting on 8 April. The hearing judge gave no reasons whatsoever for his finding that Rites was guilty of violation of probation. We do not think that the evidence regarding the failure to report on 8 April was such as to incline a reasonable and impartial mind to the belief that Rites violated the reporting condition on that date. While it was shown that Rites was directed to report on that date, there was nothing to lead the judge to believe that Hyatt, upon receiving the telephone call explaining why Rites was not appearing, did not excuse the failure to report, not at the time considering the failure a violation under the circumstances but simply directing that Rites report at another time, 16 April, as the undisputed testimony indicated.

We find it an inescapable conclusion from the record before us that no adequate record was kept of what transpired at the three brief interviews of Rites.[5] Nor did the Probation Officer recall what actually took place at the interviews, and most importantly with respect to the charges subsequently filed by him, he had no clear recollection as to specifically what he directed Rites to do or not to do. His testimony in too large a measure did not show what in fact occurred during the 20 or 30 minutes he spent with Rites on 2 February and during the 5 or 10 minutes of the interview on each of 9 and 26 February, but was based, it appeared, on what he usually told probationers under his supervision—"as a matter of habit and custom I usually do"—and on what he "may very well have indicated" although "I don't recall specific conversation." We cannot excuse the inadequacy of the evidence adduced by the State but we find an explanation for it apparent in the record. Hyatt said that at the time of the hearing he was charged with the supervision of 117

---

5. During the examination of Hyatt he produced notes made by him. Defense counsel was permitted to inspect them and found them illegible. In any event, they did not seem to assist Hyatt materially with respect to matters pertinent to the violations.

criminal probationers, characterized by him as "a very heavy work load." There was no "yardstick" as to how often each probationer reported to him—"varies with the facts involved in each case," but he was unable to see each of them even once a month. But that there may be an undue burden placed on a probation officer cannot justify a determination that a probationer violated the conditions of his probation in the absence of evidence legally sufficient to prove the charges brought. Rites is entitled to a new hearing on the charges brought by the petition of 15 April 1971 if the State desires to pursue them. There is, of course, nothing to prevent the State, if deemed advisable, from instituting proceedings based on such other violations of the conditions of probation of which it has sufficient evidence.[6]

*Judgment reversed; case remanded for a new hearing in accordance with this opinion.*

6. In oral argument before us the State suggested that a probationer may be found to have violated conditions of probation set out in the Order of Probation upon facts so showing adduced at a hearing despite that he was not charged with violations of those conditions in a petition filed against him. We feel that a probationer must in any event have reasonable notice of the conditions of probation he is charged with violating. We believe that such notice first given during a hearing ordinarily would not be adequate.