# RALPH JAY HEROLD v. STATE OF MARYLAND

[No. 706, September Term, 1981.]

*Decided September 2, 1982.*

The cause was submitted on briefs to MOORE, LISS and WEANT, JJ.

Submitted by *Peter Engel* and *Stephen L. Snyder* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Stephen B. Caplis, Assistant Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County,* and *Scott Smith, Assistant State's Attorney for Baltimore County,* for appellee.

MOORE, J., delivered the opinion of the Court.

This is an appeal from a revocation of probation and reimposition of a suspended two-year sentence. Appellant had been ordered to "attend a mental health program" and did so but was terminated as "unsatisfactory." We shall remand without affirmance or reversal, for such further proceedings as may be deemed appropriate in conformity with this opinion.

## I

Ralph Jay Herold, appellant, was charged in April 1980 with assault and battery and a fourth degree sexual offense. The complainant was the 20-year-old daughter of a woman living with appellant, then 31, divorced, and disabled by the loss of his right leg. On June 30, 1980, at a bench trial on an agreed statement of facts, the Circuit Court for Baltimore County found appellant guilty of battery. Disposition was deferred pending a presentence investigation.

The presentence investigation report, completed on August 4, 1980, stated in its "Evaluation and Recommendation":

"Herold became angry and upset when discussing the victim. He impressed this writer as a man who cannot cope with rejection of his ideals and/or way of life. *He is narrow minded and rigid in his beliefs and opinions. He may be prone to violence and, as revealed in the offense report, threatened murder and bodily harm.* In this agent's opinion this man is in need of psychiatric counseling; however, he most likely will resist therapy.

"Since Dr. Smith's [psychiatric] report is unavailable at this time, the extent, if any, of Mr. Herold's psychological problem is unknown. However, in view of the information gathered in this investigation, it is respectfully *recommended that the defendant be placed on supervised probation with the stipulation that he attend a Mental Health Clinic."* (Emphasis added.)

The report of the court psychiatrist, James E. Smith, II, M.D., was submitted to the sentencing judge on September 8, 1980. The "Summary" was as follows:

"Ralph Herold is an emotionally unstable and immature man who apparently had difficulties prior to a serious accident but who has had more obvious difficulties since. He lacks motivation to carry on any constructive activities and tends to be very sensitive about threats to his adequacy and masculinity. Weapons have apparently served to make him feel more masculine. *He has definite potential for explosive behavior and must be regarded as a threat to others. His lack of motivation for change as well as his suspiciousness and emotional volatility makes him a dubious candidate for treatment. Nonetheless, if he is placed on probation it is urged that he be required to get out-patient treatment, not only because there is an outside chance it may help him but also because it may serve as a check on his behavior and emotional status."* (Emphasis added.)

On October 10, 1980, appellant received a two-year suspended sentence and was placed on supervised probation for three years. The special conditions of probation were that (1) he make restitution of $87 to the victim through the Probation Department, and (2) he "must attend a mental health program."

On January 5, 1981, appellant was evaluated by Ibrahim

Turek, M.D., a psychiatrist at the Northwestern Community Mental Health Center.[1] Although the record before us contains no report from Dr. Turek, the "Supervision Summary" of appellant's probation agent, Leonard Goldman, in a report dated April 13, 1981,[2] states that Dr. Turek diagnosed the appellant as "borderline intellectual functioning" and that he continued to see Dr. Turek until April 1, 1981, "when he was terminated from therapy in an unsatisfactory status." Mr. Goldman's report referred to the psychiatrist's termination letter dated April 1, 1981, not contained in the record, in which Dr. Turek indicated that not only was he unable to establish a therapeutic relationship with appellant,

> "but that he also 'became a menace even to the therapist by his threatening behavior verbally and physically'. Dr. Turek also indicates that during the last session the subject displayed a knife, moving it in and out of its case with a threatening attitude."

The probation agent's "Evaluation and Recommendation" in the above report was as follows:

> "In a pre-sentence psychiatric evaluation by Dr. James E. Smith, II, M.D., the subject was found to have a 'definite potential for explosive behavior and must be regarded as a threat to others'. He was also considered a poor candidate for therapy. According to his therapist, Dr. Turek, 'those predictions came true.'
>
> *"This writer feels that the subject's attitude has worsened to a critical level, and that he must be considered a threat to himself and others. It is therefore respectfully requested that a warrant be*

---

1. The record does not disclose whether Dr. Turek saw the appellant prior to January 5, 1981.

2. A file memorandum by Judge Hormes' secretary dated January 23, 1981, states that Mr. Goldman discussed appellant with Judge Hormes that day. Dr. Turek had informed the agent that appellant "has threatened the victim in this case as well as her family friends [sic]"; but he had not attempted to carry out his threats.

*issued charging the subject with Violation of Proba-
tion."* (Emphasis added.)

The violation cited by Mr. Goldman was:

"By being terminated from a Mental Health Pro-
gram in an unsatisfactory status."

Judge Hormes signed a warrant on the date of Mr.
Goldman's report, and it was served upon appellant on May
12, 1981. Thereafter, it appears, appellant's counsel made
arrangements for an evaluation of the appellant by David L.
Shapiro, Ph.D., a certified psychologist. After seeing appel-
lant, Dr. Shapiro wrote a letter dated May 22, 1981, to appel-
lant's counsel, expressing his willingness to treat Mr. Herold
as an outpatient "for intensive psychotherapy" on the
following conditions:

"1. If, in my opinion, his condition deteriorates, or
    he becomes a danger to himself or to others, I
    will hospitalize him.
 2. If Mr. Herrold [*sic*] refuses to go along with my
    recommendation for inpatient treatment under
    such circumstances, it will be considered a viola-
    tion of his probation.
 3. I will keep the court informed of any changes in
    Mr. Herrold's treatment status, including any
    failure to adhere to the treatment plan outlined,
    or any resistance on his part to a recommenda-
    tion for inpatient treatment if such becomes nec-
    essary."

At a probation revocation hearing on June 1, 1981, appel-
lant waived his right to have his probation officer present.
The latter was on vacation and appellant, after almost three
weeks of incarceration — never having been incarcerated
before — was anxious to obtain an "expeditious hearing."
His counsel proffered that appellant was willing to see Dr.
Shapiro on his terms, that appellant's mother, who was
present in court, would help him to "straighten himself out,"

and that the real problem was appellant's inability to get along with Dr. Turek. "With all due respect to Dr. Turek," counsel stated, "there are times when a person does not click with that particular therapist for whatever reason."

The court reimposed the suspended two-year sentence, remarking:

> "Back in October 1980 I found you guilty of a battery charge, and gave you two years' suspended sentence on condition that you attend a mental health program and make restitution. I was faced at that time with the report from Dr. Smith, who is a very good medical psychiatrist, and he said you . . . are to be placed on probation to get outside help. We did that. I put you on probation. *I put you under the care of Dr. Turek, who is an eminently qualified mental health person, and what does he say? You 'became a menace even to the therapist by your threatening behavior verbally and physically.* Sir, I am not going to permit you to go outside the jail anymore. I am scared. I am worried about you, worried about society and the people around you. The sentence of the court will be two years." (Emphasis added.)

The court thereafter rejected a plea from counsel that it be made a condition of appellant's continued probation that he be hospitalized by Dr. Shapiro if "his condition deteriorates and he becomes a danger." The Court stated:

> "I have had the problem before and he did not respond. I have my responsibility, or what I think is my responsibility, to the citizens of this community. I am sorry in the sense I can't depend on this young man to go out in the street and listen to doctors."

On appeal, Mr. Herold contends that he was denied due process and that the lower court abused its discretion. In the presentation of these claims, he raises essentially two questions:

1. Was appellant denied due process of law because the revocation was based on his mental condition and his failure to achieve mental stability, and not upon a violation of a condition of probation?

2. Did the trial court abuse its discretion in revoking probation because: a) revocation was based on appellant's mental condition or failure to achieve mental stability; b) appellant did not violate any express condition of probation; c) a less stringent and more appropriate alternative was available?

## II

Probation in Maryland is defined as the conditional exemption from imprisonment allowed any prisoner by suspension of sentence. Md. Ann. Code, Art. 41 § 107 (f) (1978 Repl. Vol.). The conditions of probation "shall be determined solely" by the judge granting it, *id.,* and any condition may be modified or revoked as the court deems proper. Art. 27 § 641A (1982 Repl. Vol.). Probation is a matter of grace, not entitlement, which permits the wrongdoer to keep his freedom "as long as he conducts himself in a manner consonant with established communal standards and the safety of society." *Kaylor v. State,* 285 Md. 66, 75, 400 A.2d 419 (1979), *quoting Scott v. State,* 238 Md. 265, 275, 208 A.2d 575 (1965). The probationer (or parolee) has a right to continuance of his probation absent any violation, and this right is protected by constitutional due process. *Gagnon v. Scarpelli,* 411 U.S. 778, 785 (1973). In the rehabilitative, rather than punitive, focus of the probation/parole system, revocation is only a last resort when treatment has failed. *Id.*[3]

---

3. *See* Note, *Judicial Discretion and the Problem of the Mentally Ill Probation Violator,* 5 UCLA-Alaska L.Rev. 284 (1976). The author discusses *Trumbly v. State,* 515 P.2d 707 (Alaska, 1973), which held that insanity was not a good defense in a revocation proceeding. However, the court stated that Trumbly's mental state at the time of the probation viola-

In reviewing a trial court's revocation of probation, we must consider the two-step process initially explicated in *Morrissey v. Brewer,* 408 U.S. 471, 479-80 (1972), adopted in *Gagnon, supra,* 411 U.S. at 784, and expanded in *Humphrey v. State,* 290 Md. 164, 428 A.2d 440 (1981). The first, "wholly retrospective factual question" is whether appellant has actually violated a condition, express or implied, of his probation. *Morrissey, supra,* 408 U.S. at 479. If so, the second question is whether probation should be revoked or whether other actions are more appropriate to protect society and improve the probationer's chances of rehabilitation. *Id.* at 784, n.8. *Humphrey* underscores a third consideration: Was the violation a result of factors beyond the control of appellant and "through no fault of his own?" 290 Md. at 167-8, and cases cited therein.

Appellate review requires careful scrutiny of the factual findings below. *See, e.g., Rites v. State,* 15 Md. App. 346, 290 A.2d 554 (1972) (evidence insufficient to show violation of probation terms). A violation must be established with enough reasonable certainty — but not beyond a reasonable doubt — to satisfy the conscience of the court. *Id.* at 348. If the facts incline a reasonable and impartial mind to the belief that the probationer has violated a term of his probation, that is sufficient to revoke or modify. *Knight v. State,* 7 Md. App. 313, 318, 255 A.2d 441 (1969).

Procedural due process is satisfied if the probationer is given a reasonable opportunity to defend himself, *i.e.,* a hearing to explain his conduct. *Finnegan v. State,* 4 Md. App. 396, 401, 243 A.2d 36 (1968); *Swan v. State,* 200 Md. 420, 425, 90 A.2d 690 (1952). Substantive due process is satisfied if revocation of probation is based on the State's showing that the probationer wilfully failed to abide by the conditions, *Hudgins v. State,* 292 Md. App. 342, 438 A.2d 928 (1982), and the probationer's failure to show that the violation "resulted from factors beyond his control and through no fault of his own." *Humphrey, supra,* 290 Md. at 167-8.

---

tion and at the time of the hearing was relevant in determining whether to incarcerate him. *Id.* at 710.

Abuse of discretion will be found only if the trial court has erroneously construed the conditions of probation, *Edwardsen v. State,* 220 Md. 82, 151 A.2d 132 (1959), has made factual findings that are clearly erroneous, *Coles v. State,* 290 Md. 296, 308-9, 429 A.2d 1029 (1981), or has acted arbitrarily or capriciously in revoking probation. *Knight, supra,* 7 Md. App. at 318. *See also Burns v. United States,* 287 U.S. 216 (1932).

## III

In the instant case, appellant argues that he was denied due process because the revocation of his probation was based not on an actual violation of the special condition that he "attend a mental health program," but rather on two other factors: first, the lower court's belief that appellant's termination from the mental health program of Dr. Turek showed that he had not responded to it; and second, the court's manifest concern that appellant was a threat to others because of his potential for "explosive" behavior.

The question thus posed in the factual setting of this case is a difficult one. It is clear that the court was altogether disinclined to continue appellant on probation subject to *any* conditions, not because he had failed to attend the mental health program, as required by the special condition, but rather because of his demonstrated failure to improve his mental condition or achieve mental stability by such attendance. The latter was not, however, a special condition of his probation. *See Carradine v. United States,* 420 A.2d 1385 (D.C.C.A. 1980).[4] Until his termination by Dr. Turek, appel-

---

4. Whether, indeed, the court could have imposed such a condition is not before us. In *Carradine v. United States,* 420 A.2d 1385, 1390, n.16 (D.C.C.A. 1980), the court observed that revocation of probation based on a probationer's mental state would raise the question of unconstitutional punishment for a status or disease. *Cf.* Hyser v. Reed, 318 F.2d 225 (D.C.Cir. 1963), *cert. denied,* 375 U.S. 957 (1963) (probation may be revoked solely on the basis of predictive judgments about likely future behavior). *Compare,* Commonwealth v. Megella, 408 A.2d 483 (Pa.Super. 1979) (evidence insufficient to show defendant's insanity at time of committing acts violative of probation).

lant attended his therapy sessions, although obviously not obtaining much mental or emotional improvement from them. After his arrest and while in jail, appellant agreed to an arrangement with Dr. Shapiro for "intensive psychotherapy." Thus, appellant may not wilfully have failed to abide by the condition that he attend a mental health program. *See Hudgins, supra.*

We find support for this hypothesis in *Carradine v. United States, supra.* There, a probationer who had pleaded guilty to a charge of rape and had received a 15-year suspended sentence with five years' probation voluntarily appeared in court requesting more intensive psychotherapy than the out-patient care he was receiving as an express condition of probation. The lower court, referring to the probationer as a "walking time-bomb," revoked his probation and sentenced him to a term of two years to life. The District of Columbia Court of Appeals reversed. The opinion of the appellate court concluded that "maintenance or achievement of a particular level of mental stability was not an implied condition of Carradine's probation," and that he had been deprived of due process when the trial court revoked his probation because of his mental problems. 420 A.2d at 1390.

*Carradine* is also noteworthy for the court's recognition that, in holding probation may not be revoked under such circumstances, the appellate court confronted the sentencing judge "with a possible dilemma": the judge may be inclined to grant probation but reluctant to embrace the attendant risk unless there is an effective alternative should the probationer develop a need for in-patient psychiatric care. Speaking for the court, Judge Ferren stated, *id.* at 1391:

> "Without attempting an exhaustive analysis of alternative procedures, absent the benefit of a concrete case, we believe it is important to indicate that the court does have useful options which are not precluded by this opinion. First, when a probationer volunteers for hospitalization — as Carradine did in this case — *the court may authorize (as consistent with probation) the requested*

*voluntary hospitalization. Also, the court, in supervising the probationer, may modify the terms of probation, imposing any new condition 'reasonably related to the rehabilitation of the convicted person and the protection of the public.' Moore v. United States, D.C.App., 387 A.2d 714, 716 (1978)* (per curiam) (upholding condition requiring a mental examination and, if necessary, psychological treatment)." (Statutory citations omitted.) (Emphasis added.)

We also find instructive the decision of the Appellate Division of the Superior Court of New Jersey in an earlier case, *State v. Moretti*, 141 A.2d 810 (1958). There the conditions of probation were (a) psychiatric treatment at the probationer's expense and (b) gainful employment. The court held that the probationer's mental condition (schizophrenic reaction, paranoid type) constituted a lawful excuse for failure to maintain gainful employment and that revocation was an abuse of discretion. The court agreed that "defendant's case was not an easy one to handle," and continued:

"But then, problems are naturally anticipated in the field of probation. Revocation should not be used as a means of resolving difficult cases, nor should it be used merely to punish a technical violator for failure to adhere to regulations. There should be as much constructive purpose in committing an alleged violator to prison as there was in placing him on probation in the first instance. Probation conditions are a means to an end, not an end in themselves." *Id.* at 822-3.

In *United States v. Mercado*, 469 F.2d 1148 (2d Cir. 1972), the lower court revoked probation and imposed a term of imprisonment after finding that the probationer had violated a special condition that he avoid telephone harassment of the family of a young woman toward whom he had demonstrated a pathological infatuation. There was

substantial testimony concerning Mercado's mental health both at the time he committed the acts which allegedly violated his probation and at the time of the hearing. Speaking for Chief Judge Friendly and Associate Judge Feinberg, Judge Lumbard held that the lower court had abused its discretion:

> "*It seems clear, at least on the record before us, that a term of imprisonment for Mercado will still not serve any useful rehabilitative or deterrent function and certainly will do nothing to cure his mental illness.* If Judge Ryan had not erroneously concluded that Mercado was responsible for his violation of probation, he might well have acted upon Dr. Sallick's suggestion that he could have Mercado admitted as a patient at the Payne-Whitney Clinic. *Certainly the district court has the power to make it a condition of continuing Mercado's probation that he apply for and obtain admission to that or a similar institution for treatment.*" (Emphasis added.) *Id.* at 1153.

In this case, the court demonstrated a proper concern for the interests of society and the potential risk to the public if appellant continued at large without improvement of his mental condition. However, appellant was willing to undergo therapy and had secured the services of a forensic psychologist toward that end. In effect, he would be changing from a public mental health program to a private one, which carried the proferred guarantees that: 1. he would be hospitalized if he became a danger to himself or others; 2. his refusal to commit himself voluntarily if so ordered by Dr. Shapiro would be a violation of probation; and 3. his failure to adhere to a treatment plan set up by Dr. Shapiro or any resistance to his recommendations would be reported to the court. We think that this mental health program may well have been adequate to meet the trial judge's quite understandable concern. At all events, we think the proposal was worthy of careful consideration and would jus-

tify further proceedings at which Dr. Shapiro's testimony could be received. "[W]ithout attempting to fix blame, . . . the sole objective at this time should be to remedy the situation and to obtain the needed treatment for defendant." *People v. Welch,* 397 N.E.2d 94, 97 (Ill.App. 1979). *See People v. Bowman,* 423 N.Y.S.2d 242 (1980). The cited cases demonstrate that those seeking psychiatric help do not always succeed initially in obtaining it. Nor do those who obtain it necessarily benefit from it initially. The very inability to benefit from counseling is a symptom of the condition that necessitates counseling. It should not also be a premise for punishment. Accordingly, we shall remand for further proceedings.

> *Case remanded without affirmance or reversal for further proceedings not inconsistent with this opinion; costs to be paid by Baltimore County.*